# THE BALTIMORE AND OHIO RAILROAD COMPANY *vs.* THE POTOMAC COAL COMPANY.

*Construction of an Agreement for the Transportation of Coal—*
*A License Revocable at Will.*

On the 1st March, 1864, the appellant in reply to an oral communi-
cation from the appellee of the previous day, wrote to the appellee:
"that provided you will place your own cars upon the B. & O. R.
R., to be used in the transportation of coal from Piedmont to Balti-
more, we will agree to the following conditions: 1st. To allow one-
fourth of one per cent. per ton, per mile, for cars so used. 2nd. To
make good any damages to the cars caused by accidents, the fault
of the B. & O. R. R. Company. This obligation does not include
any damages which may be done by the military forces, either of
the United States or of the Confederates. 3rd. To keep the cars in
repair, and to charge for this service the actual costs thereof, as
charged in first class shops. 4th. We can make no actual agree-
ment to give your cars prompt transit over our road. We are now
increasing our motive power, and hope to be able to move promptly
all cars used in coal trade, but in the event of our inability to do
so, we will furnish to your cars a proportion of the whole amount
of power used in the general coal business. We cannot agree to
give you a number of cars equal to that you furnish." After the
receipt of this letter the appellee provided one hundred cars at an
expense of about seventy-five thousand dollars, and these cars have
been used ever since by the appellant for the transportation of the
appellee's coal, and have been kept in repair by the appellant at
the appellee's expense. On the 6th March, 1874, the appellee wrote
to the appellant, that the Potomac Coal Company contemplated the
purchase of some additional coal land and might, therefore, wish
to increase their business; the Company, therefore, "requested the
privilege of putting on some additional hoppers, on same condi-
tions as agreed to," in the appellant's letter of the 1st March, 1864;
to which letter the appellant replied, on the 11th March, 1874,
"that we will extend to your Company the privilege of placing
some additional hopper cars upon our line, upon the same condi-
tions as agreed to in the letter of 1st March, 1864." After the receipt
of this letter, the appellee made further purchases of coal lands,

Balto. & Ohio R. R. Co. *vs.* Potomac Coal Co.

and erected improvements on them, and excavated and raised coal transported by the appellant.  In April, 1876, the appellant notified the appellee, that the allowance for the use of its coal cars would be reduced to one-eighth of one per cent. per ton, per mile.  In an action brought by the appellant to recover from the appellee the difference in tolls and freight between the allowance of one-fourth of one per cent. per ton, per mile, and that of one-eighth of one per cent. per ton, per mile, from the 18th April, 1876, to the 23rd June, 1877, it was HELD :

That the arrangement between the appellant and the appellee as evidenced by the above letters was a mere license to the appellee, revocable at the will of the appellant.

APPEAL from the Circuit Court for Howard County.

On the 8th August, 1878, the Baltimore and Ohio Railroad Company instituted suit against the Potomac Coal Company, for the purpose of recovering the sum of thirty-two thousand, three hundred and eighty-one dollars and seventy-seven cents, being a balance due from tolls and charges on coal and merchandise carried and transported by the plaintiff over the line of its railroad, in the cars of the defendant, at its request, from the 18th day of April, 1876, to the 23rd day of June, 1877, inclusive.  The declaration further alleged, that the plaintiff, owning and operating a railroad between the City of Baltimore, and where are located the mines of the defendant, had transported and carried from said mines to various points on and off the line of its road, from the 18th day of April, 1876, to the 23rd day of June, 1877, inclusive, cars of coal shipped by the defendant, and for the carriage and transportation of said coal, the plaintiff being a common carrier, had charged the defendant for tolls and freight, the sum of one hundred and fifty-one thousand and fifty dollars and forty cents ; of which sum the defendant had paid one hundred and eighteen thousand six hundred and sixty-eight dollars and sixty-three cents; leaving the above balance due by the defendant to the plaintiff.

The case was docketed by consent as of the March Term, 1878, of the Court below; the general issue was pleaded short by consent; and it was agreed between the parties to the suit to waive a trial by jury and submit the cause to the Court for decision upon an agreed statement of facts, which are substantially stated in the opinion of the Court.

It was further agreed, that if the Court should be of opinion, that upon the statement of facts, the arrangement by which the plaintiff allowed the defendant one-fourth of a cent per ton per mile for the use of its cars, as shown by the letters set forth in the opinion of the Court, was lawfully revoked and annulled, then the Court should enter judgment for the plaintiff for the aggregate of one-half of the amounts of the respective balances, as shown by the column marked "E," of the accounts filed, which were shown by said account to have accrued since the date when the Court should be of opinion that said arrangement was so revoked and annulled, with such interest thereon as the Court should think ought to be allowed; and if the Court should be of opinion that the said arrangement had not been lawfully revoked and annulled, then the Court should enter judgment for the defendant, with costs.

On the 30th September, 1878, the finding and judgment of the Court, (HAMMOND and HAYDEN, J.,) were rendered in favor of the defendant for costs. The plaintiff appealed.

The cause was argued before BARTOL, C. J., BRENT, MILLER, ALVEY and ROBINSON, J.

*John K. Cowen* and *Henry E. Wooten*, for the appellant.

We maintain, that the arrangement between the appellant and appellee, as made by the letter of March 1st, 1864, is but a license, or in the nature of a license revocable at will.

A license is thus defined: It "is a power or authority given to a man to do some lawful act, and is a personal liberty to the party to whom given, which cannot be transferred over, but it may be made to a man or his assigns. There may be a parol license as well as by deed in writing, but if it be not for a certain time, it passes no interest; and if there be no time certain in the license, as if a man license another to dig clay, &c. in his land, but not say for how long, the license may be countermanded, though, if it be until such a time, it cannot be." *Popham*, 151; *Jacob's Law Dictionary, Title License; Foster vs. Browning*, 4 *R. I.*, 47.

In this case a license or "privilege" is given to the appellee, to place its own cars on the road of the appellant, for the transportation of its coal to Baltimore. This "privilege" or license is to be enjoyed on certain conditions. No time is fixed for the duration of the license, or during which the privilege is to be exercised. This is left simply to the interest of the two parties to determine. The appellee does not bind itself to furnish any number of cars, nor to continue the use of them on the road for any definite period. The appellant, on the other hand, does not bind itself to permit this "privilege" to be enjoyed for any definite period; in other words, does not grant the license for any prescribed time. The law is as old as the books, that the grant of such a privilege is determinable at the will of the grantor. *Hays vs. Richardson*, 1 *G. & J.*, 366.

The general doctrine is, that a mere license may be revoked at the pleasure of the licensor, although the licensee has incurred expense. *Bouvier's Law Dict., Tit. License*, and authorities there cited; *Jackon & Sharp Company vs. P. W. & B. R. R. Co.*, 2 *American Railway Reports*, 81; *Foster vs. Browning*, 4 *R. I.*, 47.

The only application of the doctrine of the irrevocability of executed licenses that could be made to this transaction

would be this: if, before any attempt was made to terminate the arrangement, the cars loaded with coal were placed on the tracks at Piedmont, the appellant would be bound to haul such cars to Baltimore, and pay the stipulated price for their use. As to all acts to be done after that, the license is, in the very nature of things, an executory one, revocable at will. *Carter vs. Harlan,* 6 *Md.,* 20; *Houston vs. Laffee,* 46 *N. H.,* 505.

But the appellee contends that the letter of March 1st, 1864, constituted a contract, and because a contract, it cannot be revoked except with the consent of both parties. It is entirely immaterial what we call the arrangement which was made by that letter. The question is not advanced towards an answer by calling the arrangement a contract. Admit it to be a contract, yet the question still remains, how long does the contract last? Is it terminable at the pleasure of either party? Does it provide by implication that the use of the cars, at the stated price, is to continue forever? These questions still remain, no matter what baptismal you give the arrangement between the two companies. There are many business arrangements of great importance which are contracts, and yet they are determinable at the will of either party. Contracts of partnership, where no period is fixed during which the co-partnership is to continue, are terminable by either party on notice. *Story on Partnership, sec.* 269, *and note.*

The answer to the claim that parties would not make a contract of the kind in question, unless it were for all time, is two-fold: The contract shows for itself that it was not to be for any definite period, and that the parties simply relied on each other's interest and good will to continue it is as long as it would be for their mutual benefit; and that it is impossible to believe that business men would make a fixed rate for all time for car-*use* which necessarily depended on the rate for car-*transportation,* notwithstanding

the change which might be made in the rates for freight for transportation in those same cars.

It seems to us, therefore, perfectly clear that the arrangement between the two companies was terminable upon notice; that it was so terminated by the notice given; and that the railroad company is entitled to recover the amount shown to be due by the agreed statement of facts.

*William Shepard Bryan,* for the appellee.

Let us put ourselves in the place of the parties to this contract, and consider the circumstances under which it was made, the inducements which the parties had to make it, and the purposes which it was intended to accomplish. This is the best mode of ascertaining its legal construction. *Nash vs. Towne,* 5 *Wallace,* (*S. C.,*) 688, 699. The appellee had purchased valuable coal lands, and it was desirous of providing an economical mode of getting its coal to market. With this view an application is made to the appellant, and the result was, that in March, 1864, a contract was made. The condition to be performed by the appellee was that it should provide cars. When this condition was performed, the appellant was bound to make the allowance of one-fourth of a cent per ton, per mile. At the time of the contract the war was in progress and there was considerable risk to the cars.

It is easy to see on the face of the contract that the appellant had not a sufficient number of cars to carry on its business. It therefore naturally was anxious to make a stipulation that the appellee should furnish its own cars.

The appellee provided cars at an expense of more than seventy-five thousand dollars; and it was bound to bear the expense of keeping these cars in repair.

We see that the appellant secured business for its road and saved the large expense of purchasing cars and keeping them in repair, and avoided the risk of damage to them by the military forces of the belligerents. On the other hand the appellee secured a reduction in freight.

The contract was carried out for ten years to the satisfaction of both parties. In March, 1874, the appellant is informed that the appellee contemplates the purchase of additional coal land, and wishes to put more cars (*hoppers*) on the road. Its wish is acceded to by the appellant. (The number of cars is not mentioned, but the correspondence shows a continued acknowledgment by the appellant of the existence of the contract of March, 1864.) On the faith of this last agreement (which is in fact a mere republication of the former one,) the appellee expends a hundred and seventy-five thousand dollars in the purchase of additional lands.

We see therefore, that the appellee performed the condition precedent to the appellant's liability, by an expenditure of seventy-five thousand dollars; and that on the faith of its continued existence, it made the other large expenditure above mentioned.

Now the purpose of the parties in these transactions cannot be mistaken. The appellee intended to secure a cheap mode of getting its coal to market; and the appellant for the valuable considerations mentioned, intended to furnish this cheap transportation. The appellee had coal lands which it intended to exhaust of its coal. This was the purpose for which they were purchased. And the appellant well knew of this intention; and that the object of making the contract was to enable the appellee to carry this intention into effect. The contract was to endure not for a day, or a week, or a year merely, but until its purposes should have been effected.

Looking a little further into the facts surrounding the transaction, and viewing them as the parties viewed them when they made the contract, we see that the appellee's profits on a ton of coal are less than the allowance of the quarter of a cent contracted for. If this allowance is refused, the appellee can make no profit on its large investments; but must abandon its business, or prosecute it at a loss.

If the appellant has the right to rescind this contract now, it could have rescinded it as soon as these expenditures were made. We may ask, is it rational to suppose that the parties intended by their contract that the appellee should make no profit from their large investments; or that it should make a profit only so long as it might suit the pleasure of the appellant. A right to be enjoyed a week, or a month, or a year at the caprice of another would be no right at all. It would be absurd to call such a precarious indulgence by the name of a *contract*.

The law has wisely and beneficently provided that neither party can rescind a contract at his pleasure, unless it contains a stipulation authorizing him to do so. *Addison on Contracts, page* 975, *at top.* The learned author cites the case of the *Great Northern Railroad Co. vs. The Manchester, Sheffield, &c. Railroad Co.*, 5 *DeGex & Smedes*, 138, to which the attention of the Court is respectfully requested. It was a case where a contract had been made between two railroad companies, which allowed one to use the track of the other. There was no limitation of time in the contract, and the Court decided that it was permanent in its character, and endured until it should be rescinded by mutual consent; and also prevented the breach of it by injunction. The Court is also referred to *Fowle vs. Bigelow*, 10 *Mass.*, 379, where a contract about a gate was construed to be perpetual in its obligation.

A party may contract to carry away all the grain from a farm, or all the coal from a mine. There is nothing in law to prevent him from doing so. He may also contract to transport another's cars, until all the coal in a mine is exhausted. There is nothing illegal or immoral in such a contract.

When the letter of March 1st 1864, was written, each of the parties to this suit well understood the position and circumstances of the other. There could be no mistake about their wishes, purposes and interests. The appellee

was engaged in mining coal and sending it to market, and the appellant was transporting it over its road from Piedmont to Baltimore. The parties were both bodies corporate, and their business was of a permanent character. The letter of March 1st, 1864, is a proposition to the appellee from the appellant. Provided the appellee will place its own cars on the Baltimore and Ohio Railroad to be used in the transportation of coal from Piedmont to Baltimore, the appellant says it will agree to certain enumerated conditions. The appellee accepts the proposition and places the cars on the railroad for the use of the appellant. The natural consequence is, that these conditions become binding. And from that time for twelve years they were regarded as binding by both parties. At length the appellant assumes of its own authority to release itself from the most important of these conditions, and to substitute a new one in its place.

The agreement on the part of the appellant is formally stated in distinct articles. It states "*We will agree to the following conditions,*" and then enumerates three obligations which it is to assume, and in the fourth article it studiously guards against making what it calls an "*actual agreement.*" Thus making it certain what it agreed to and what it did not *actually* agree to.

The furnishing the cars for the use of the appellant, at an expense of seventy-five thousand dollars to the appellee, was the valuable consideration for the appellant's contract. The design and purpose of the contract contemplated a continuous use of the cars. Each party knew that the business of the other was intended to endure for a great length of time; the appellant's perpetually and the appellee's for forty years, the limit of its corporate existence. It was a desirable object to the appellant to procure these cars from the appellee.

It saved the outlay of its own money, for it had not a sufficient number of its own, as we see from the last lines

of the letter; it saved the cost of repair which would become necessary, and it escaped the danger of damage from the belligerent forces then in the field. The terms of the contract refer to a permanent use of the cars; there is an agreement to *keep them in repair* on certain terms; not to repair them once or twice; but to provide that they shall be always in a state of repair. Constant use of the cars would make repairs necessary, and these repairs were to be continually made, as often as required; to *keep in repair* means that there is to be no cessation or intermission of the state of repair.

The fourth article of the contract says, "we are now increasing our motive power, and hope to be able to move promptly all cars used in coal trade; but in the event of our inability to do so, we will furnish to your cars a proportion of the whole amount of power used in the general coal business. We cannot agree to give you a number of cars equal to that you furnish." These expressions all point to the future, and shew that a continuous use of the cars was contemplated by the contract, and that the appellant was providing for one of the contingencies of the future.

Now we may ask, is there a single syllable in the contract which intimates that it is to endure only during the pleasure of the appellant. Is it rational to suppose that the appellee understood that, after incurring so great an expense to obtain the benefit of the drawback, it was to be retained only so long as the appellant might see fit to grant the indulgence? that · it might be withdrawn immediately after the first trip? It is very certain that such was not the intention of the appellee. Did the appellant draw up so formal a contract, with such distinctly articulated terms, for the purpose of granting an indulgence which it might revoke the next day? We cannot suppose it; but if such were the meaning it intended the contract to bear, it would be illegal and immoral to insist

upon such a construction, when it must have known that the other side entered into the contract with a different interpretation of it. *Benjamin on Sales,* 39; *Chitty on Contracts,* 104.

It was known that the cars would be of use to the appellant as long as they were in existence; and they would not be of the slightest use to the appellee, except for the purposes of this contract. They were to be kept in repair, so as to prolong the period of their existence as much as possible. In all its features the contract looks to the future, and to a continuance of the business carried on between the contracting parties. How long was it intended to be carried on? Certainly so long as the cars could be made to endure by continual repairs. They were procured on the faith of this contract; they were to be kept in repair for the purposes of this contract; and they were worthless to their owner except for these purposes. For striking instances of contracts construed to be continuing, the Court is referred to *The Great Northern Railroad Company vs. The Manchester, Sheffield, &c. Railroad Company,* 5 *De Gex & Smale,* 138; and to *Stirling vs. Maitland,* 5 *Best & Smith,* (117 *Eng. C. L R.,* 840.) *Vide* also, *McIntyre vs. Belcher,* 108 *Eng. C. L. R.,* 664.

But if we can consider the convention between these parties as merely an indulgence or license, granted by the appellant; it is an indulgence which has caused the outlay of a great deal of money with a view to the enjoyment of it. It is well settled, that it cannot be withdrawn without previously tendering the expense which the grantee has incurred under it. *Addison vs. Hack,* 2 *Gill,* 227–8, and cases therein cited; *Liggins vs. Inge,* 7 *Bingham,* 682, (20 *Eng. C. L. R.;*) *Rerick vs. Kern,* 14 *Sergeant & Rawle,* 271.

The doctrine on this subject bears considerable analogy to that of estoppel *in pais. Swain vs. Seamans,* 9 *Wal-*

*lace*, 274, (at close of opinion;) *Pickard vs. Sears*, 6 *Adolp. & Ellis*, 474.

ROBINSON, J., delivered the opinion of the Court.

This suit was brought to recover freight claimed to be due by the appellee, on account of coal transported over the road of the appellant.

On March 1st, 1864, the following letter was sent to the appellee:

"NEWELL CLARK, Esq.

"*Dear Sir:*—The President directs me to reply to your communication of yesterday, and to state that provided you will place your own cars upon the Baltimore and Ohio Railroad, to be used in the transportation of coal from Piedmont to Baltimore, we will agree to the following conditions:

"1st. To allow one-fourth of one per cent. per ton per mile for cars so used.

"2nd. To make good any damage to the cars caused by accidents, the fault of the Baltimore and Ohio Railroad Company. This obligation does not include any damages which may be done by the military forces either of the United States or of the Confederates.

"3rd. To keep the cars in repair, and to charge for this service the actual cost thereof as charged in first class shops.

"4th. We can make no actual agreement to give your cars prompt transit over our road. We are now increasing our motive power, and hope to be able to move promptly all cars used in coal trade, but in the event of our inability to do so, we will furnish to your cars a proportion of the whole amount of power used in the general coal business. We cannot agree to give you a number of cars equal to that you furnish.

"Yours, respectfully,

"JNO. KING, JR., *Auditor.*"

After the receipt of this letter, the appellee provided one hundred coal cars, at an expense of about seventy-five thousand dollars, and these cars have been used ever since by the appellant for the transportation of the appellee's coal, and have been kept in repair by the appellant at the expense of the appellee.

On the 6th March, 1874, the appellee sent the following letter to the appellant.

"OFFICE POTOMAC COAL CO.
"*No.* 60 *Devonshire St.,*
"*Boston, 6th March,* 1874.

"JNO. KING, JR.

"*Vice-President of the Balt. & Ohio R. R. Co., Baltimore.*

"*Dear Sir:*—The Potomac Coal Company contemplates the purchase of some additional coal land, and may therefore wish to increase their business, I would therefore request for our company the privilege of putting on some additional hoppers on same conditions as agreed to in your letter of March, 1864, to Mr. Newell Clark, acting director of Potomac Coal Company at that time. Copy of that agreement please find enclosed. As we are to have a meeting on Wednesday next, your reply previous to that will much oblige

"Respectfully, yours,

"GILMAN CURRIER, *Prest.,*

"*per* C. CHADBOURNE."

To this letter the appellant sent the following reply:

"BALTIMORE, *March* 11*th,* 1874.

"GILMAN CURRIER, Esq.

"*Dear Sir:*—Referring to your favor of 6th inst: President King directs me to reply, that we will extend to your company the privilege of placing some additional hopper cars upon our line, upon the same conditions agreed to in his letter of March 1st, 1864, to Mr. Newell Clark.

"Yours, truly,

"N. GUILFORD, *G. F. A.*"

After the receipt of this letter, the appellee made further purchases of valuable coal lands, and erected upon them valuable improvements, and excavated and raised from said lands some of the coal transported by the appellant, for which tolls are demanded in this suit.

In April, 1876, the appellant notified the appellee, that the allowance for the use of its coal cars, would be reduced to *one-eighth of one per cent. per ton per mile.*

The appellee contends that the letters of March 1st, 1864, and March 11th, 1874, constitute a *perpetual contract,* by which the railroad company is obliged to use for all time, the cars furnished by the appellee, and to allow therefor *one-fourth of one per cent. per ton per mile.*

On the other hand, it is contended that the privilege granted to the appellee, is a *mere license revocable at the will of the appellant.*

It strikes us at the outset, as it did the counsel for the appellant, that if this is to be considered a contract binding for all time, it is strange that it should take the form of a letter written by the auditor of one company, in reply to an oral communication made by the managing director of the other. Contracts of so much importance and of such magnitude are not usually made in this loose and informal manner. Yet it was competent nevertheless, for the parties to make a contract even of this character by letter, and if such appears to have been their intention, it is as binding as if it had been made in a more formal and solemn manner. The true interpretation of all instruments is to make them speak the common intention of the parties at the time they were made. If this intention is expressed in plain and unambiguous terms, there is no room for construction, and the parties must be presumed to have intended what they have expressed. On the other hand, if the language is somewhat obscure and ambiguous, we may look not only to the face of the instrument itself, but also to the circumstances under

which it was made, and the motives that led to its adoption.

It is not contended that the railroad company has in express terms, agreed to use the cars furnished by the appellee for all time, at a certain stipulated price. There is nothing in the letter of March 1st, 1864, to justify this contention, because although the appellant does agree to allow the appellee to provide cars for the transportation of its own coal, and to allow a certain sum per ton per mile, for the use of the cars, there is not a word to be found in the letter about the duration of the agreement or privilege, or the terms upon which it is to be terminated. But the argument is, the appellee being the owner of large and valuable coal mines, and being permanently engaged in the business of mining coal for market, it is unreasonable to suppose that it would have incurred the expense of providing cars to be used in the transportation of its coal, under a *privilege or license* revocable at the will of the railroad company.

On the other hand, it may be said that the letter of March, 1864, was written during the late civil war, and although the appellant might be willing under the then existing circumstances to grant or extend to the appellee the privilege requested, it is equally unreasonable to suppose that the railroad company intended thereby to make a contract binding for all time. That under the then existing charges for freight, the appellant might very well afford to allow the appellee *one-fourth* of one per cent. per ton per mile, yet if freights should in the future decline, arising from the competition of other roads, or from other causes, the sum thus allowed might in fact be equal to the entire profits earned by the railroad in the transportation of the appellee's coal.

Much may be said therefore on both sides, in regard to the reasonableness or unreasonableness of the different constructions to be put on the letter of March 1st, 1864.

There is one thing, however, about which there can be no dispute, the basis of the agreement was the self-interests of the respective parties. The appellee was anxious to get its coal to market, and the appellant was unable to furnish the cars necessary for its transportation. Under these circumstances it might be to the interest of the coal company to provide its own cars, and on the other hand it would be to the interest of the railroad company, to allow a certain proportion of the freight for the use of the cars by which the coal was shipped to market. Nothing was said by either party in regard to the duration of the the agreement, and in the absence of a stipulation of some kind in this respect, it is but fair to presume that it was to continue so long, and no longer than their respective interests should require. If the appellee should find *one-quarter* of one per cent. not enough, or if it could make better terms with another road, it was at liberty to withdraw the cars placed on the road of the appellant, and if the latter should find the rate too much, more than it could afford to pay, it had the right to notify the appellee and thus revoke the license.

But be this as it may, there is nothing in the letter of *March 1st*, 1864, or the circumstances under which it was written, to satisfy us the appellant ever intended to make a perpetual contract. And this view is strengthened by the letter of *March 6th*, 1874, written subsequently by the appellee, requesting the *privilege* of putting on some additional cars, and the answer of the appellant saying we will extend the *privilege*. Not one word about a contract or rights under a contract, the language is *"privilege"* and the favor asked is the extension of the *privilege*. This is not certainly the language of parties in making a contract to bind each other forever, and in regard to a matter of so much importance to both.

But apart from these views, there is another objection, and one which in our opinion, is fatal to the contention

of the appellee. It is essential to the validity of every contract of this character, that there should be *a mutuality of obligation.* A contract is not binding on one of the parties, unless it is binding on the other.

Here, there is no obligation of any kind resting upon the appellee, for the breach of which an action would lie at the instance of the appellant. It was not obliged either to furnish the cars, nor to keep them on the road after they were furnished. It might put them on the road one day, and take them off the next, just as its own interests might require. Cases are to be found it is true, of *executed contracts*, where one has received the benefit of the consideration for which he bargained, and in which it is no answer to an action to say, the plaintiff was not bound by the terms of the original contract to do the act, and that there was therefore no mutuality of obligation. As for instance, in cases put in the books:

"Suppose I say if you will furnish goods to a third person I will guarantee the payment, there you are not bound to furnish the goods, yet if you do furnish them in pursuance of that contract, you may sue me upon the guaranty." *Fishmonger Co. vs. Robertson,* 5 *M. & G.,* 131; *Robinson vs. Jones,* 17 *Law Jour. Ex.,* 36; *Mills vs. Blackall,* 11 *Q. B.,* 356.

This however, is not the case of an executed contract, the consideration of which has been received by the railroad company, for although the coal company did furnish cars for the transportation of its own coal, yet it has the right at any time, to withdraw them from the road, and for so doing there is no breach of obligation on its part.

But it is also argued, that even conceding this to be a license, it cannot now be revoked, because the coal company has upon the faith of it, expended money in providing cars, which were necessary to the enjoyment of the license granted.

There is a well recognized distinction between a *mere license revocable at will,* and a license *coupled with an*

*interest*, which is irrevocable so long as the interest continues.

Many decisions are to be found, where one has erected buildings or constructed works of a permanent character under a license upon the land of another, in which it has been held, that the license is *irrevocable*, or that it cannot be revoked without adequate compensation to the licensee. Such are the cases relied on by the appellee, and others of the like character will be found in 2 *American Leading Cases*, (*4th Ed.*,) 733, &c.

These cases, however, are based upon a contract either express or implied, that the licensee shall be permitted to use and enjoy the buildings erected and works constructed; or upon the doctrine of estoppel, whereby one will not be permitted to repudiate his own acts or conduct upon the faith of which another has acted. This case, however, does not come within the operation of these principles. There was no agreement here either express or implied, that the coal company should enjoy the privilege extended to it, one day longer than the mutual interests of the parties should require.

And although the appellee may have expended money in providing coal cars, there is nothing in the record to show, that it was done upon the faith of an irrevocable license. The cars do not belong to, nor are they in any sense attached to the road of the appellant, and although the appellee might suffer loss to some extent by the revocation of the license, it does not necessarily follow, that the cars would thereby be without any value whatever.

It follows from what we have said that the judgment must be reversed, and the cause remanded, to the end that judgment may be entered by the Court below in conformity with this opinion.

<div style="text-align: right;">

*Judgment reversed, and*
*cause remanded.*